Good morning, Your Honor. Tony Farmani on behalf of Mr. Scott. Good morning. Good morning. Your Honor, I must admit, you know, having worked on this case for the past few years, and trying to make sense of, you know, the evidence and what happened, it's still somewhat of a mystery to me, frankly. And, of course, I take, you know, I feel that I'm not alone in this, simply because, from the very get-go, the judge who heard the preliminary hearing testimony from the witness to the shooting felt that this was never a first-degree murder case. This should have never been a first-degree murder case. Well, the problem, you know, I can see why it came back, having been a trial judge and having been a trial lawyer on all of this, is that Mr. Scott, you know, I think he had a decent case if he wanted to say mistake or if he wanted to say accident, which he was entitled to do. I mean, obviously your defense is what your defense is, but it was basically what we call what the Saudis, some other dude, did it. And so it wasn't him, and then the deceased gets found. The body is discarded, and it's in a blue tarp that matches blue tarp in his backyard. Well, Your Honor, he doesn't. Respectfully, Your Honor, he doesn't. He didn't match. He didn't match. Well, but what I'm saying is all of that went before the jury. And when you, you know, I've seen enough. If the jury had bought that he didn't do it, then that's a not guilty. But if you say you weren't there, then you put yourself a little bit in a position that then they can make all inferences in the other direction. And so the disposal of the body, if it was really an accident, doesn't, doesn't bode that well for him. Well, correct, Your Honor, except that this case, this case theory was first degree murder. It wasn't. Now, I understand what the Court is saying, saying why didn't Mr. Scott present a different, a better defense. Well, but it's sufficiency of the evidence. And after, when someone gets found by, guilty by a jury, we have to give all inferences in favor of the verdict. And, you know, so what you do is you look at the eyewitness testimony here, which was Charles Graves. He, at the very least, he gave two different stories, correct? One of which was that the shooting happens outside and the body gets dragged into the house. That is not first degree murder. We don't know what happened. We don't know there was a confrontation between people, as he said it, to the police, to the dispatch, and later on to the police officers. And then he comes at a trial and testifies as something completely different. That makes absolutely no sense when you take into account the forensic evidence. Now, keep in mind, Your Honor, if Mr. Scott wanted this to be, wanted to be ---- Okay. But let me, let me play the devil's advocate. Is it first, could it be first degree murder if, obviously, there were some bullets in the gun, all right? The part of the theory of the case was that there was, I think from the prosecution's standpoint, there were, the defendant was angry that he was sold a defective gun, okay? But the fact that bullets came out, then we know that there were, I don't know how many bullets. They didn't recover the gun, right? They never recovered the gun. Okay. But that being said, you got click, click, click, click, click, but he keeps clicking and there are bullets in there. A jury ----  Six times. I know, but a jury could say, they could infer, he's the one that loaded the gun and if he kept clicking it and he knows that there's bullets in there, that means that he intended to kill someone. And the instruction, as you know, on premeditation, is it doesn't require a long period of time. It could be ever so short, but you have to, so why couldn't the jury infer from that? That's what, I mean, that's the hurdle that you have to go uphill on. I mean, if you look at the timeline, you have to, if you put this in perspective which is ---- I'm just trying to tell you, don't argue your jury case here. It has to be insufficient as a matter of law. I completely understand. The question is whether or not a reasonable juror could have determined there was premeditation deliberation. And the response to that, Your Honor, is absolutely not, because ---- All right. But if you know, could a reasonable juror have assumed or inferred that if he loaded the gun and he clicked it six times and kept clicking it, that he was really serious about shooting someone? That's assuming you believe the second story to be true. Well, but that's what they ---- But the verdict is entitled to all inferences, any inferences that are there that could support it. So if the jury believed the second story, if the jury believed what I'm saying, how is it insufficient for first-degree murder? Where is the planning activity? Where is the evidence of that? Does first-degree murder require ---- Require. But how long does it have to be? It doesn't have to be. It has to be some indication. It has to be some planning activity, some motive, some matter of killing where it would indicate premeditation deliberation. There is none here. I mean, what you have here essentially within seconds, within a span of maybe 30 seconds, you got a person pulling a trigger, assuming the second story to be true, pulling a trigger three times against the wall between the two people and then turning the gun on Mr. Hemmings and pulling the trigger three more times. And we also know, before the fourth fatal shot happens, we also know that the bullets that were recovered, two of them, had been hit but not fired. So there is some doubt here, Your Honor. And the jury felt there was doubt. I know that this is a high order. I completely realize that, Your Honor, but I don't think the state who the Constitution says has the burden of proof to show every single element, I don't think the state meant it. I mean, it's quite clear when you sit down and look at the case over and over again, which I have because I had to, I can't make sense out of it. And the jury on the fourth day of deliberations, Your Honor, stood at 11-1. And one of the juries wanted to be excused so an alternate comes in, another four days, four to five days passes before they reach a verdict. This is not an easy case when, by all means, in fact, Your Honor, the evidence, the evidentiary evidence. Okay, but what we have here is the conviction and what we have is the evidence in the trial. And we have to look at all of that. It's not, it doesn't, whether it took them four days, whether it took them four minutes, that doesn't go to the sufficiency of the evidence. Well, it does indicate that, and the jury asking for closing arguments, I mean, I have an uncertified issue, which is the IAC related to the location of the car. Now, I know that's uncertified technically, but if you bring that in, I don't think you can really divorce the two issues from one another. The prosecutor here felt or believed that Mr. Scott used his car to dispose of the body. But there was evidence that his car was, in fact, was in a repair shop from September 7th, five days before the actual shooting. And then the owner saying that he was there for approximately two weeks and then back on September 19th. Isn't there some evidence in the record that there was a strategic decision that was made? Isn't there a letter? It's a letter from appellate counsel saying it's not substantiated by any means. On the record, the prosecutor, when the judge asked the prosecutor directly, do you have anything to say about this? Because all this came out after the trial, when the jury was deliberating. Now, there was some discussion about the car before when there was a speedy trial issue. Mr. Scott, do you want to weigh in? Well, isn't there, while the jury was out, the judge heard some, there was some discussion about putting in something about the car. And he denied the motion to reopen after the car. Particularly because Mr. Scott was so stubborn about his speedy trial rights. And my understanding is Mr. Scott never had any criminal background. Although not a model citizen, he never had any criminal background. So he felt like he should move forward because he's innocent. And the only way I can make sense out of this would be if a man is innocent, if he felt that he didn't do a particular crime, then he would act like Mr. Scott would. Either that or he's just mentally not there. He's, I don't think. Okay, these are all good jury arguments. So let's come back to the. What about, I think the car issue is important here, Donna. Because Mr. Scott, although he came out at the course of evidence, the whole issue itself was discussed pre-trial. Counsel knew about this car. Knew that the prosecutor wanted to use this car to prove first degree murder. Planning activity. Deliberation. But what happened was there was actual evidence in the record, undisputed evidence in the record indicating that Mr. Scott's car was not, was in a repair shop. And we have a next door neighbor saying, I didn't see his car the evening of the murder. The next door neighbor says, I saw it early in the morning. Now, if a man has used a car to dispose of the body, why would he bring it up in the morning, five o'clock in the morning right there when he knows the police are still investigating? And the police shows up at the scene, finds nothing. I think when you put all this together, it really, I understand the court is going to say, well, this is a jury issue. But not entirely, Your Honor. Because you do have, you do have to take into consideration that there are times where the jury does make a mistake when you can't really give a much deference. And this is one of those cases. It's a rare case. I mean, it is an odd case. You have a person who was offered 11 years at the beginning of the case. When an eyewitness said, I saw the shooting, he didn't want to take it because he felt very strongly about his innocence. Now, he is not a good person. He was a drug dealer. And that came out at trial. But that doesn't mean he should be sent to prison for first-degree murder, Your Honor. To me, it's just, you know, I've been doing this kind of work for quite some time, both before as a law clerk and as an attorney. And this case, to me, it is not a first-degree murder case by any means. Now, I'm not saying if the facts are construed most favorably to the state, it's not, you know, any type of murder, but it's not first-degree. It just simply isn't. Then you have the IAC issue, and I would really ask the court, I would respectfully ask the court to have the state respond to him, particularly because the trial court, who looked at the evidence, said that this was a car that was bloody. Does the whole premise underline the trial court's reasoning for denying that claim? Well, there's a letter in the record that indicates that Scott's trial counsel, this is by appellate counsel, did not introduce the evidence of the auto shop receipts because it would have opened the door to evidence of witness intimidation by Scott's family. What's the letter referring to? I have no idea, Your Honor. There was no one. The prosecutor was asked directly in court, what do you want to say? And she said, well, the only thing I can think of is that trial counsel wanted to have a strategic reason because Mr. Scott wanted to change the tires to, you know, to be able to cover up the crime. There is no evidence he ever changed the tires. There's no evidence there was any blood in there. I mean, the forensic, the DNA analysts for the state said that even if the car were to be cleaned, there would still be signs of DNA blood in there. And there was none. And there was none on the door handle where they checked. And there was just some – that car was not used in the commission of the crime. And when you have a case where the jury's deliberating for 10 days, two separate juries asking for witness testimony, and when the defense counsel knows about these receipts and doesn't do anything, about these invoices, doesn't do anything, I think if that's not IAC, if that's not prejudicial in the fact that this is a cancer, I don't know what else would be, Your Honor. And then you have a trial court, an escape court, saying that it rejects the claim based on a reasonable determination of facts, clearly says that there was blood in the car. There was no blood in the car, never. There was never a car with blood in it, whether it be Mr. Scott's car or anyone else's. So did you depose defense counsel on this? You're talking about the trial counsel, right? Yes. I did not, Your Honor, because I've asked for evidentiary hearings. Mr. Scott asked for evidentiary at all levels. It was never afforded one. And that's just – that's just the way the State court does its thing. They simply – Well, it's not – there are cases on – they're being a little bit glib on that point because that, you know, that there are IAC claims where defense counsel falls on his or her sword and says, you know, I should have introduced this, and that's not unheard of. I mean, there are ways to put on more of that. What defense counsel said was I couldn't get definitive dates. That's not true, Your Honor. That's absolutely not true. The defense counsel's investigator went to those – to the auto body shop, asked the owner. The owner said, I'm quite certain it was September, because that's when I opened the shop. And Mr. Scott's car was there for two months. So is that in the record? That's all part of the record. He submitted that to the State courts. And the State court never even mentioned it in his analysis. What the State court did was say the car had blood in it when there was no blood in the car. Do you want to save any time? Absolutely, Your Honor. Thank you. Good morning. Good morning, Your Honor. May it please the Court, I'm Kevin Vietta, a California Deputy Attorney General here for Respondent. This case turns importantly on one factor, and that is that the jury was permitted to, in fact, required to infer that there was no accident. That is, based on Mr. Graves' testimony, the response of Mr. Scott upon shooting Mr. Hemmings was not consistent in any way, in any rational way, with accident. He shot him, and then he turned to Graves and said, what are you looking at? And then shot at Graves. That's why this case was not tried. Well, that is an important reason why Scott chose not to treat this as an accident case. Well, assuming that obviously I asked questions of appellant's counsel, when you look at the evidence that the jury had, what are the permissible inferences that would support first-degree murder here? Well, if it's not an accident, and the Court of Appeals said the evidence showed that it wasn't an accident, but if it's not an accident, then the evidence shows that it was an intentional killing. That is, as the prosecutor argued, Scott, who had to be, who was aware that there was the chance of misfiring or the possibility of defect with gun, but he knew what the defect was because he must have tested it himself. Scott came downstairs, said this, you sold me a bad gun, and I think the inference to be drawn there by the jury is that there was a dispute over a drug sale. That is, Scott had sold drugs to Hemmings and had not been paid with appropriate consideration for that exchange. He came downstairs with the gun, immediately lifted it, started pulling the trigger. According to the prosecutor's argument, it was reasonable to infer that he knew that it wouldn't fire initially, but he knew it would fire eventually. And then he turned to Hemmings and shot him in the eye. So if it's not accidental, then it's intentional. If it's intentional, what is the evidence of when he intended to, when did he form that intention to shoot? And the answer to that is reasonable for the jury to infer that it occurred before he came downstairs. He brought the gun. He was taking it out of the case, taking it out of the case, not just presenting it to Hemmings and saying you've given me a bad gun. He's taking it out of the case. He gets to the bottom of the stairs. He immediately lifts the gun and begins pulling the trigger. From that, the jury could infer that there was an intentional killing and that intent was formed several seconds or minutes earlier when he got the gun and took it out of the case. What about disposal of the body? The California Court of Appeal, I think, somewhat mistakenly said we won't look at disposal of the body because that's, I believe the footnote says, that's not necessarily inconsistent with other than premeditation. Perhaps true. But it supports the rational inference of the jury that what happened was not an accident. That is the defendant's rapid response in disposing of the body. And there is no question, I think, that Hemmings was killed inside his house. There's no other explanation for that. Wasn't there blood evidence of the victims inside the house? Yes. I think it is abundantly clear that he was shot inside the house. And he was shot inside the house and then his body was gone shortly thereafter. And there was evidence that there was a cleanup in the house. So that was consistent with or that corroborated the inference of the jury that there was no accidental shooting. And that is absolutely essential to the way the jury viewed the rest of the evidence and is why they confer that there was no or that there was a plan to kill. You say that evidence is essential to your case? That there was no accident? No, that the essential to your case that it was first degree premeditated murder, that he was transported away immediately in the defendant's car. Well, I don't say he was transported in the defendant's car. He was transported in a car. And I think it's possible he was transported in the defendant's car, but that's not essential. He was transported in a car. That is, he goes from the front of the house, based on the neighbor's statements, out the back of the house where a car arrived. And he's found several miles away and had to be transported there somehow. So he was transported by a car. But the prosecution proved that it was in his car that he was transported away. It didn't prove it. I would say that based on the evidence that was admitted at trial and based on the information known to the prosecutor, that was a rational argument made by the prosecutor suggesting that it was his car because his car was observed not to be present shortly after the killing occurred. Okay. So we're on AEDPA review. What is the last recent state court decision on the merits that we should be looking at? On the merits of the certified issue, it's the opinion of the California Court of Appeal denying this question. I think the precise reference is excerpts of record, page 42. The California Court of Appeal decision denied his sufficiency claim on direct appeal. Okay. However, this is very confusing to me because the sufficiency claim that he raises in the habeas petition is the Jackson v. Virginia. You agree with that, right? That was the claim he raised on direct appeal as well. But, yes, I agree. Right. Okay. So the Fourth District Court of Appeal didn't treat it in that way. In fact, it doesn't even mention Jackson v. Virginia. It treats it as a people v. Robarch claim. It says, although title is sufficiency of the evidence argument, what the defendant actually contends is the trial court erred in denying his motion to reduce the verdict to second-degree murder. And Robarch is a very different standard than the Jackson standard, isn't it? Yes, but look, the standard for denying a motion for new trial may be different. But at ER 40, the Court of Appeal said, excerpts of record, page 40, the Court of Appeal begins the paragraph by saying, we disagree with the defendant's assertion that the evidence was insufficient as a matter of law to support first-degree murder. They addressed that question directly and expressed it. Are they addressing the federal question, or are they still using the Robarch standard? No, I think at that point they're addressing the ‑‑ How can you tell? Well, because that's the way the case was briefed in the Court of Appeal. It was briefed as a Jackson question. What's the latest standard? Did we just make it up for them if they didn't say it? Well, it's quite clear that they don't have to say it. And I'm sure you would agree that the California courts are quite familiar with the Jackson standard and apply it daily. I don't know. But this is close to me. And what it bears on is do we give this opinion deference or do we review it de novo under Harrington v. Rector, right? So this is really close. And so maybe you could just point to me why all the reasons you think this is actually a Jackson v. Virginia merits decision. Well, I apologize, Your Honor. The opening brief is not in the excerpts of the record, and I didn't include them. This is something that I'll be happy to. I believe it was a lodgment number three in the district court. And I do have ‑‑ I seem to have the opening brief. No, the opening brief in the direct appeal. In the direct appeal? Yes, Your Honor. Okay. And I'll be happy to forward that to the court. But I'm quite sure it's lodgment number three. I have confidence it's lodgment number three. And it was briefed as? Jackson v. Virginia. A sufficiency question. Maybe you could submit that to the court. All right, I'll be happy to. And it was responded to. I do have the response brief responding to it as a sufficiency of the evidence. A response brief from the district court. Okay. Well, maybe just those pages from both of the briefs you could submit. All right, I'll be happy to. Thank you. Can you deal with the uncertified issue? Exactly what the situation, you know, why we shouldn't entertain it? It doesn't matter which car he was taken in. Quite simply, he was taken in a car. So if his car was, and I don't think that's clearly established, but if his car was in the shop and there was some ambiguity, it went from one shop to another, and that record is not then ‑‑ I would say there's no declaration under the penalty of perjury establishing precisely where it was on the 12th and on the 13th, but it doesn't matter. It was clear that the victim was shot in the apartment. It was clear from the statement of neighboring witnesses that the shooting occurred, and shortly afterward they heard people in the backyard, and I think heard a car in the backyard, and the body was gone shortly thereafter when the police arrived. So it had been taken by a car. Was it significant that he was shot in the eye? I think it's significant because although I think Mr. Farmani misstates the importance of what he calls the Anderson factors, those don't alter the elements of the crime of murder. What was significant about the shooting in the eye is that the manner of killing is reflective of premeditation. Can you extrapolate that for me? How that is? Yeah. If you want to kill someone, there's hardly a better place you can shoot them than in the eye. Well, I recall as a child watching cowboy movies, and the bad guy got shot right between the eyes. That's the perfect place. What was the forensics evidence about the distance of the ‑‑ There was a good deal of discussion about the distance between the muzzle of the gun and the face of the victim. Mr. Graves said that he said they were standing about 8 feet apart at the time of the shooting. And assuming that that's accurate, he says 8 feet apart. The prosecutor then spent a good deal of time questioning and arguing, talking about, well, the gun was extended at arm's length. Mr. Scott is 5 feet 10 inches tall from what you might infer that his arm was 2 1⁄2 feet long. Graves said that the gun was about 12 inches long at one point, but then he said later that it was a short barrel gun. And the forensic evidence was that the stippling on the wound showed that the weapon had been fired from an intermediate distance, which the expert said was perhaps a foot or so. So we have perhaps some conflict or perhaps some confusion between what, 8 minus 3 or so, 5 feet. So the evidence from the forensic person was it wasn't a contact wound. Correct. But there was stippling that indicated it was an intermediate distance, which there was some estimate of a foot. Precisely, although that was an uncertain estimate because it was a function also of the ammunition that was used and how powerful it might be. So it wasn't like a shot in the air or across the street or something like that. And that goes back to Judge Myrtle's question, what's the significance of the wound being in the eye? It shows that Scott intended to kill. He fired right directly at the face of his intended victim. Would you explain again why he couldn't have asserted an accident defense? I mean, I think he could have tried. There's never been an IAC claim on that? Not yet. I mean, there has not been. Not yet. Well, somehow Hayden's never seems to end. It seems occasionally never ends. The difficulty with the IAC claim is that He didn't testify at trial, right? He did not. In fact, the defense put on no evidence at trial. They relied on a cross-examination of the prosecution's witnesses and the timeline essentially arguing that it couldn't have happened and the inconsistencies were raised. But here's why an accident defense would not have worked. First of all was the response of Scott after shooting Hemings was not consistent with the accident. An accidental shooting doesn't result in turning immediately at the one eyewitness and shooting at him. The second thing is that the evidence in the record was quite clear that Mr. Scott was familiar with firearms. He had several in the house. He had two handguns and at least one long gun. And perhaps significantly, one of the handguns was found secreted in the cushions of the couch in the living room area. So Mr. Scott was someone who was not just familiar with handguns but who had them readily available. And there's some discussion, and I don't have the page for this, but I read it last night and I'll get the page if you like. There was some discussion that Mr. Scott, as he was explaining why he was going with the defense of I didn't do it, said that I was in the military. And so I'm confident the prosecutor will develop that information to show his additional familiarity with weapons. I think the court has heard enough from me. First, I wanted to mention that I did forward the record. I was asked by the records department and I did forward the opening brief to the court. On direct appeal? On the direct appeal. So we must have it somewhere. Okay, don't submit it. I'll look for it, and then if I need it, I'll send out an order. Your Honor, one thing I wanted to point out is the two witnesses, other than Mr. Graves, the two neighbors, both of whom testified that when they heard the shooting, it felt like it came from the outside. And the blood being found in the house is fully consistent with Mr. Graves having been shot outside and dragged inside the house because the blood was found on the front door entry carpet. That was the only place there was blood. So it's fully consistent with the first story that Graves gives to the police. The shooting that Your Honor brought up, the matter of the shooting, the state tries to make it sound like Mr. Scott actually aimed and shot him right between the eyes. That's not at all what happened. In fact. Mr. Scott wasn't there. No. Mr. Scott's defense was not that he wasn't there. During the in-camera hearing, he said, I didn't shoot anybody. It was something that happened outside that spilled into my house. Is that in the trial? That's part of the inquiry. Is that part of what the jury considered? No. Okay. We have to, on EDPA review, we need to look at what the trial was and then there's a double. Well. On any review, I admit that, Your Honor. But the underlying question, another underlying question here is the IAC claim. It wasn't brought up because of counsel. And frankly, counsel didn't have time. Counsel did not have time to do stuff because Mr. Scott insisted on his speedy trial rights. He wanted to go forward. And the judge was just baffled by it. And all of this is in the brief. The judge is baffled. The judge says it and says, look, I don't know what you're trying to do to yourself. Are you basically committing suicide? Are you trying to put yourself in prison when you have a defensible case? I mean, if you even take Gray's testimony, if you accept everything he says to be true, it doesn't add up to intentional killing. What it does show is that Mr. Scott was a dumbfounded man. He really was someone who was very adamant about his innocence. But he was dumb. He wanted to go forward. He had too much confidence. That's what this case shows. And the judge, when the judge denies Mr. Scott's motion to reopen evidence to admit these things, he said that. He said, hey, you should have thought about this when you were insisting on your speedy trial rights, when you weren't giving your counsel enough time, as if to get him back for basically exercising his right. So you're saying the court should have, after the jury went out, reopened evidence and give him a redo? I think when the jury— All right. Do you have some cases to support that? No, I don't, Your Honor. I don't think—I'm not blaming the trial court for that. I'm blaming the trial counsel court because this is really easy stuff. This is basic investigation. And counsel had enough evidence, at least, to explore it. And I don't—you know, the quote that you're giving me, Your Honor, respectfully, that—I don't know where that comes from. I know it comes from a letter that Appellate Counsel wrote to Mr. Scott. There is absolutely no support for it. I mean, that is not because of Mr. Scott's fault. He asked for it in an evidentiary hearing. I think I understand your arguments. Thank you. Thank you, Your Honor. Thank you, counsel. The case is carried. It will be submitted.
judges: REINHARDT, WARDLAW, CALLAHAN